Meghan Draper Hiller
924 E. Eveningstar Ln.
Tempe, AZ 85283
(415) 602-4606
draper.hiller@gmail.com

FILED ✓    LODGED ___
RECEIVED ___    COPY ___

APR 0 6 2022

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Meghan Draper Hiller,<br><br>    Plaintiff,<br><br>v.<br><br>Arizona Board of Regents,<br><br>    Defendants. | No.   **CV22-00554-PHX-CDB**<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

For her Complaint against Defendant Arizona Board of Regents, Plaintiff Meghan Draper Hiller ("MDH") alleges:

**JURISDICTION AND VENUE**

1. Plaintiff's discrimination claims in this matter arise under Title II of the Americans with Disabilities Act of 1990 (Pub. L. 101-336) and Section 504 of the Rehabilitation Act of 1973 (Pub. L. 93-112).

2. This court has original subject matter jurisdiction over those discrimination claims pursuant to 28 U.S.C. § 1331.

3. This court has supplemental jurisdiction over Plaintiffs' other claims pursuant to 28 U.S.C. § 1367.

4. Venue is proper in the District of Arizona because all parties reside in the State of Arizona, and, upon information and belief, all of the events and omissions giving rise to the claims occurred within the State of Arizona.

## PARTIES AND RELEVANT INDIVIDUALS

5. Plaintiff Meghan Draper Hiller ("MDH") is a resident of Tempe, Maricopa County, Arizona. In spring 2021, MDH was enrolled as a student at Arizona State University ("ASU").

6. Defendant Arizona Board of Regents is the governing body for Arizona's public university system, including Arizona State University. Claims against Arizona's public universities are to be brought against the Arizona Board of Regents.

7. Upon information and belief, Stephani Etheridge Woodson is a resident of Maricopa County, Arizona. At all times relevant to this Complaint, she was the Interim Associate Dean of Students for ASU's Herberger Institute for Design and the Arts ("HIDA").

8. Upon information and belief, Alicia Wackerly-Painter is a resident of Maricopa County, Arizona. At all times relevant to this Complaint, she was employed within ASU's Student Accessibility and Inclusive Learning Services ("SAILS"), formerly the Disability Resource Center ("DRC"), and was MDH's disability services coordinator.

9. At all times relevant to this Complaint, Dean Woodson and Ms. Wakerly-Painter acted in the course of their employment with, as the agents of, and on behalf of Arizona State University.

## MDH'S STATUS ENTERING THE SPRING 2021 TERM

10. In 2016, MDH enrolled in the Masters of Interior Architecture ("MIA") degree program within HIDA, a department of ASU.

11. The critical element of the MIA program is the studio component. Graduation from the MIA program requires the completion of six consecutive semesters of studio. Other classes in the MIA program are designed to prioritize studio, from the setting of deadlines to coordinate with studio deadlines to designing class assignments to build upon work done in studio.

12. While other classes have some level of flexibility in scheduling or even

choice of courses, studio must be completed in order. Withdrawing from a studio course means delaying completion of the program by an entire year, since that course cannot be made up and will not be offered again until the following year.

13. MDH previously received disability accommodations as an undergraduate student at ASU. Upon enrollment in the MIA program, those disability accommodations were renewed.

14. As a student in the MIA program, MDH required disability accommodations for migraines, for vision issues, and for complex post-traumatic stress disorder ("CPTSD"). MDH additionally suffered ongoing ill effects from intrahepatic cholestasis of pregnancy, which primarily consisted of terrible puritis (itching) which worsened in the evening and at night, making concentration on evening classes particularly difficult. MDH had disclosed these conditions to and discussed them with DRC/SAILS.

15. Disability accommodations granted to MDH included flexible assignment deadlines, flexible attendance, and access to larger-print course materials or a monitor for ease of reading.

16. MDH's disability accommodations, as communicated to her instructors, specifically provided that "Medication side effects or flare up of the disability may cause an interruption in the student's ability to complete projects in a timely manner…. Delays due to flare up may trigger a request for modified assignment deadlines or a grade of incomplete, to provide the student the opportunity to fully demonstrate course accomplishment and maintain GPA."

17. Despite the inadequate accommodations and the difficulties posed by the ongoing Covid-19 pandemic, MDH persevered and entered the Spring 2021 semester on schedule to graduate following either the Spring 2021 or Summer 2021 term.

18. As a result of various factors, particularly the worsening of MDH's migraines because her classes were conducted exclusively through the Zoom teleconferencing platform during the Covid-19 pandemic, MDH entered the Spring 2021 term with several incomplete courses from Spring 2020 and Fall 2020 (as well as one

course from Fall 2019 that was completed, but required action from her instructor to change her grade).

19. MDH promptly uploaded her completed studio project for Fall 2020 on January 17, 2021 and presented it to reviewers on January 26, 2021.

20. Even in advance of her first classes in the Spring 2021 term, MDH was already communicating with her professors for that term about her past bad experiences with the "Revit" software package, describing herself as "nearly phobic"; about her SAILS accommodations; and about how Zoom often caused or worsened her migraine symptoms. At the same time, she had reached out to the professors for whose courses she still had incomplete grades in order to arrange to complete those courses.

**ACCOMMODATIONS NEEDED IN THE SPRING 2021 TERM**

21. Even before the Spring 2021 term began, MDH was experiencing worsening migraine symptoms. After several months wait to get an appointment with her eye specialist, MDH learned on or about February 26, 2021 that her vision prescription had changed significantly in a matter of months.

22. MDH was also dealing with various computer issues related to the Revit software platform and to an earlier computer crash.

23. MDH promptly reached out to Professor Hancock (her Construction Documents instructor) regarding the issue of her vision prescription and the expense of getting her glasses replaced quickly. She requested that Professor Hancock agree to an incomplete grade in his course to allow her to complete the coursework, on which she was now behind, at her own pace to ensure she did not miss out on the critical skills that coursework was intended to develop. Professor Hancock expressed willingness to figure out a plan to complete his course.

24. On or about March 15, 2021, following those communications with Professor Hancock, MDH reached out to Dr. Bender (the head of her program) and Alicia Wackerly-Painter (her SAILS coordinator) to describe her circumstances. MDH's expressed wish was to focus on her Spring 2021 studio course, and to extend her Spring

4

2020 incompletes. She was told there was no specific process or paperwork to request further extension of incomplete courses, which was "100% the instructor's decision."

25. MDH understood from these communications, and from Professor Hancock's willingness to "figure out a plan," that she would be allowed to take an incomplete in Construction Documents so that she could familiarize herself with the Revit software package and complete the Construction Documents coursework during the summer.

## REFUSAL OF ACCOMMODATIONS AND UNPROFESSIONAL, UNWARRANTED ABUSE BY DEAN WOODSON

26. On or about the morning of Thursday, April 1, 2021, Ms. Wackerly-Painter e-mailed MDH that she had spoken with the department and "they indicated they <u>are going to approve</u> any additional incompletes or extensions at this time" (emphasis added), and further explaining that Dean Woodson was now "aware of the situation."

27. In reliance on this e-mail, which confirmed her understanding that she would be able to focus on her studio project and complete Construction Documents afterwards, MDH took a three-day weekend off to rest and to celebrate her birthday with her family.

28. Later that afternoon, Ms. Wackerly-Painter sent out a recall notice on her earlier e-mail and resent a second, virtually identical e-mail. Finally, Ms. Wackerly-Painter sent yet another e-mail, stating that there was an (unidentified) error in her first e-mail, and to rely on the later e-mail instead.

29. The only difference between the two e-mails – which was not pointed out by Ms. Wackerly-Painter nor emphasized in any way – was the change of a single word to now state that the department "indicated they are <u>not</u> going to approve any additional incompletes or extensions" (emphasis added and not in original e-mail).

30. On the morning of Monday, April 5, 2021, MDH received an e-mail from Professor Hancock that after discussions with the MDH's DRC/SAILS coordinator and HIDA administration, he could not approve an incomplete and could only grant an

extension on past assignments until April 30.[1] Professor Hancock also communicated that he would not grade anything after May 10.

31. Only moments later, and still in tears, MDH received a telephone call from Dean Woodson. MDH was initially relieved to receive a call from someone that could help with the situation. Instead, Dean Woodson was condescending and hostile.

32. Among other things, Dean Woodson accused MDH of "playing the system," told MDH that she was "not special," and told MDH that Dean Woodson could "get rid of any incomplete I want" (by turning it into an F). Dean Woodson also told MDH that she had "no business" being in the MIA program. Dean Woodson continued this abusive tirade even after MDH had broken down crying on the phone call.

33. Critically, Dean Woodson stated that MDH already had "too many" incompletes and would not be allowed any more.

34. MDH tried to explain to Dean Woodson that most of the incompletes were near completion, and that one only required that the instructor change MDH's grade because all work had been submitted. Dean Woodson ignored such information and explanations, and never changed her initial incorrect understanding of the situation in subsequent acts and communications.

35. When MDH told Dean Woodson that many of her incompletes were because of struggling to deal with the impact of Covid-19,[2] Dean Woodson responded dismissively that "lots of people have a hard time with Covid," and told MDH that what she "needed" was a complete medical withdrawal. A complete medical withdrawal would have wiped out all of the work that MDH had done for the entire 2020-2021 school year and further delayed her completion of the program by at least a year.

36. Dean Woodson demanded that MDH submit a plan to finish her Spring 2020

---

[1] Extension of assignment deadlines was an existing disability accommodation to which MDH was already entitled.

[2] In fact, ASU had instructed professors and staff to be empathetic, respectful, thoughtful and kind in light of the unprecedented difficulties posed by Covid-19.

6

incompletes, and all of her Spring 2021 classes, by the end of the semester. MDH warned Dean Woodson (and others at ASU) that this situation was untenable and damaging for her, and even had her psychiatrist call Dean Woodson on MDH's behalf, but Dean Woodson (and, later, Ms. Wackerly-Painter) refused to take that telephone call.

37. Dean Woodson imposed two critical restrictions on MDH: (1) MDH was not permitted to take any additional incompletes and (2) MDH was not permitted to extend the deadline for completion of any existing incompletes.

38. Some of MDH's instructors, including for courses in Codes and Green Building, had already agreed to extension of incompletes into early summer 2021. Dean Woodson sought to interfere with and deny MDH these extensions. Dean Woodson also told sympathetic instructors that they could not grant incompletes to MDH.

39. ASU, the graduate college, and HIDA do not have any policies prohibiting incompletes because a student already has "too many" incompletes, nor any policy forbidding extensions of incomplete deadlines with the instructor's permission.

40. Any non-disabled individual in MDH's position – which is to say, struggling with courses during the Covid-19 pandemic – would have been permitted to receive any number of incompletes with instructor permission, and would similarly have been permitted to extend any number of existing incompletes with instructor permission.

41. Dean Woodson manufactured the limitations placed on MDH out of antipathy towards MDH and towards MDH's insistence on utilizing her already-approved disability accommodations.

42. MDH was denied the accommodations she sought – accommodations that would have been permitted to any other student and that ASU already recognized as necessary for her disability – not despite her disability status, but rather *because* of her disability status.

43. Dean Woodson's interactions with MDH were deliberately and needlessly hostile and unpleasant. Dean Woodson knew that MDH was in a position of particular vulnerability and susceptibility to harm, and that her actions would complicate preexisting

trauma. Dean Woodson intended that her actions would cause such harm.

44. Dean Woodson intended her actions to force MDH to withdraw from ASU's MIA degree program and to prevent MDH's graduation.

45. Dean Woodson's conduct, including particularly her verbal abuse and berating of a stressed, crying student previously diagnosed with CPTSD, was extreme and outrageous.

**MDH SUFFERS HARM FROM DEAN WOODSON'S ACTIONS**

46. MDH complied with Dean Woodson's various unreasonable demands for planning and communication, as well as the unnecessary and harmful deadlines imposed by Dean Woodson without any basis in ASU's academic policies.

47. These demands and deadlines placed substantial stress upon MDH, and interfered with both her physical and mental wellbeing and her ability to spend time with her young daughter.

48. In addition to the demands placed on MDH's time and attention by Dean Woodson, and the unnecessarily shortened deadlines, Dean Woodson interfered in MDH's selection of an internship or final required elective course in the Summer 2021 term.

49. Dean Woodson prohibited MDH from enrolling in any "Session A" course for Summer 2021, including classes that met the requirements of the MIA program. Dean Woodson attempted to force MDH to enroll in an elective course that MDH had already notified HIDA was emotionally harmful for MDH.

50. MDH was qualified for the course in which she wished to enroll, and had already secured instructor permission to do so. The restrictions placed on MDH's summer course selection had no basis in ASU's policies.

51. Resolving the summer enrollment issue required additional time and attention that MDH could ill-afford to spare.

52. Following the imposition of Dean Woodson's demands and her denial of MDH's disability accommodations, MDH sought assistance from another dean at ASU. That dean was unable to successfully intervene to modify any aspect of MDH's situation

as created by Dean Woodson, but did confirm that no policy prohibited the disability accommodation (incompletes) requested by MDH. That dean also confirmed that ASU regularly extended incomplete grades for graduate students.

53. MDH also sought assistance from DRC/SAILS through her supposed advocate, Ms. Wackerly-Painter. Not only was Ms. Wackerly-Painter either unwilling or unable to intervene in any way on MDH's behalf, she did not even appear to understand the purpose or nature of MDH's disability accommodations or requests. Ms. Wackerly-Painter collected incomplete information from MDH's instructors and/or Dean Woodson, never sought information from MDH, disregarded or ignored MDH's communications, failed to understand the structure of the MIA program and why MDH was seeking an incomplete, and failed to uphold MDH's disability accommodations (which were clearly applicable and consistent with the notices that Ms. Wackerly-Painter herself had sent to MDH's instructors at the beginning of the semester).

54. Although MDH had repeatedly communicated to Ms. Wackerly-Painter regarding the flare-ups in her symptoms and additional difficulties that posed, Ms. Wackerly-Painter told MDH that her accommodations were for flare-ups, not because MDH simply wanted to focus on something else. This communication demonstrated that Ms. Wackerly-Painter did not understand what was happening and made no effort to understand the large amount of information available to her, much of it provided directly to her by MDH.

55. Ultimately, MDH was narrowly able to timely submit her Spring 2021 and prior incomplete course work on or before August 10, 2021. Until shortly after that date, it was not clear whether MDH would be allowed to complete her studies and graduate at all.

56. MDH has been unable to secure employment in the architecture industry or in any job requiring an MIA degree.

57. Dean Woodson's denial of needed accommodations was unreasonable, contrary to ASU's policies and guidelines, and motivated by unprofessional and improper

antipathy to MDH. Dean Woodson's communications with MDH were unnecessary, unreasonable, unprofessional, abusive, and motivated by improper antipathy to MDH.

58. Dean Woodson's actions had the direct, immediate, and foreseeable results that:

(a). MDH rushed through her studio project instead of completing it to an acceptably high standard, thus harming her portfolio with which to seek post-graduation employment;

(b). MDH was forced to hire a tutor to coach her through use of Revit in order to complete her Construction Documents course;

(c). MDH was forced to rush through her instruction in the Revit software package, which reduced her overall familiarity with Revit and her retention of the lessons intended to be taught by the course, largely defeating the point of taking the course in the first place;

(d). MDH must take on future expenses associated with acquiring familiarity and skill with the Revit software package to qualify for positions in the industry;

(e). MDH was denied the opportunity to apply for and benefit from an internship in the industry in Summer 2021, which poses a significant obstacle to finding a job in the industry because even "entry level" positions are looking for prior experience (ordinarily obtained through an internship);

(f). MDH required additional medical and psychiatric care that would not have been necessary but for Dean Woodson's actions;

(g). MDH completed the Summer 2021 session exhausted, discouraged, and in need of recovery time before she could seek and undertake gainful employment;

(h). MDH lost any opportunity for formal, structured feedback from classmates, instructors, and academic and industry professionals associated with the HIDA program, including but not limited to their review and commentary on

her projects, portfolio, and resume;

(i). MDH suffered extreme stress and emotional pain and suffering, including lost sleep, lost time with her young child, and a significant loss of confidence in her knowledge and abilities in the field;

(j). MDH's CPTSD was exacerbated, particularly with respect to the Revit software package and to computer-based activities critical to employment in the industry;

(k). MDH was unable to make time to meet with her therapist for weeks and additionally her progress in psychological therapy was set back, costing her years of difficult and expensive progress; and

(l). MDH lost confidence in her abilities and, particularly, in the likelihood that others in the industry, including potential employers, would be able to see past or accommodate MDH's disabilities.

59. Dean Woodson knew or should have known that these harms would result from her actions, and either intended or recklessly disregarded the high possibility that these harms would result from her actions.

**FIRST CAUSE OF ACTION – DISCRIMINATION**

60. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

61. MDH is a qualified individual with a disability and, in fact, ASU recognized MDH's status as an individual with a disability and committed itself to the provision of necessary accommodations, including extended deadlines and incompletes.

62. But for MDH's disability and the accommodations previously granted to her because of it, MDH would have received the accommodations she needed for the Spring 2021 semester (and that any non-disabled student with their instructor's permission would have received in her place).

63. Dean Woodson acted – and thus caused HIDA and ASU to act – with discriminatory intent.

64. MDH is entitled to compensatory damages in an amount to be proven at trial.

**SECOND CAUSE OF ACTION – BREACH OF CONTRACT**

65. MDH was registered with the DRC/SAILS as a student with disabilities.

66. MDH's enrollment with ASU was governed by ASU's policies, procedures, and rules, and included the disability accommodations secured through DRC/SAILS.

67. MDH's enrollment with ASU included a contractual right to receive necessary disability accommodations.

68. Dean Woodson's actions were in breach of the terms of MDH's enrollment with ASU.

69. ASU's failure to provide and honor disability accommodations to MDH was in breach of MDH's contract with ASU.

70. The denial to MDH of extensions and/or incomplete course status, contrary to ASU's own policies and procedures, was a breach of the terms of MDH's enrollment with ASU.

71. As a result of ASU's breaches, MDH foreseeably suffered damages, pain and suffering, and emotional distress in an amount to be proven at trial.

**THIRD CAUSE OF ACTION – NEGLIGENCE**

72. ASU had a duty to MDH, as a student enrolled at ASU, to provide reasonable disability accommodations, and to provide a safe learning environment.

73. ASU also had a statutory duty to provide MDH with reasonable disability accommodations and a safe learning environment.

74. By registering MDH with DRC/SAILS and assigning her a disability resources coordinator, ASU further assumed a duty to provide MDH with reasonable disability accommodations.

75. The actions of Dean Woodson, and the failure to provide disability

accommodations, breached ASU's duty of care towards MDH.

76. As a foreseeable result of ASU's negligence, MDH suffered damages, pain and suffering, and emotional distress in an amount to be proven at trial.

**FOURTH CAUSE OF ACTION – NEGLIGENT SUPERVISION**

77. Dean Woodson's actions were outrageous and constituted intentional infliction of emotional distress on MDH.

78. Dean Woodson was unsuited to her role as interim Dean of Students for reasons including but not limited to her rude and adversarial attitude towards students and staff.

79. ASU knew or should have known that Dean Woodson was likely to treat students with hostility, and that she would not appropriately address their concerns nor needs for disability accommodations.

80. ASU was negligent in promoting, retaining, and supervising Dean Woodson.

81. Ms. Wackerly-Painter was incompetent and ineffectual in her role as a disability resources coordinator.

82. Ms. Wackerly-Painter failed to effectively advocate for students with disabilities, including MDH.

83. ASU knew or should have known that Ms. Wackerly-Painter was likely to be negligent in her role as a disability resource coordinator.

84. ASU was negligent in training and supervising Ms. Wakerly-Painter.

85. As a foreseeable result of ASU's negligence, MDH suffered damages, pain and suffering, and emotional distress in an amount to be proven at trial.

**FIFTH CAUSE OF ACTION – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

86. Dean Woodson's conduct, including but not limited to her verbal abuse of a crying student and her deliberate efforts to prevent that student from graduating or remaining in the program, was extreme and outrageous.

87. Dean Woodson intended her actions to cause emotional distress to MDH.

88. MDH suffered severe emotional distress as a result of Dean Woodson's actions.

89. MDH is entitled to compensatory and punitive damages in an amount to be proven at trial.

**PRAYER FOR RELIEF**

90. Based upon the foregoing, Plaintiff requests that this Court award:

    (a). Compensatory damages;

    (b). Punitive damages;

    (c). Reasonable attorney's fees and costs;

    (d). Such other and further relief as the Court shall deem proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED this __05__ day of April, 2022.

_____
Meghan Draper Hiller